### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD HENDERSON,
  *Plaintiff*,                          CASE NO. 4:14-CV-12675-LVP-PTM

*v*.

COMMISSIONER OF                DISTRICT JUDGE LINDA V. PARKER
SOCIAL SECURITY,               MAGISTRATE JUDGE PATRICIA T. MORRIS

      *Defendant*.
_____/


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 10.)

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Donald Henderson was forty-six years old at the time of the administrative hearing on September January 28, 2013. (Transcript, Doc. 6 at 70, 157.) Plaintiff worked as a custodian in a dry cleaner business for three years and as a truck driver for fifteen years before his alleged disability onset date. (Tr. at 182.) Plaintiff filed his claim for DIB on February 24, 2012, alleging that he became unable to work on August 19, 2011. (Tr. at 157.) The claim was denied at the initial administrative stage. (Tr. at 97.) In denying Plaintiff's claims, the Commissioner considered "other urinary tract disorder" and all types of sprains and strains. (*Id*.) On January 28, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Dawn M. Gruenburg, who considered the application for benefits de novo. (Tr. at 70-90.) In a decision dated February 21, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 29-47.)

On May 7, 2014, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On July 9, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.    Standard of Review**

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered de novo by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek

2

review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides Supplemental Security Income ("SSI") to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI

are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730

(6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be

determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step

process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity

of limitations caused by" an impairment that precludes performance of past relevant work.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse*

4

*v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.    The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through March 31, 2014, and had not engaged in substantial gainful activity since August 19, 2011, the alleged onset date. (Tr. at 57.) At Step Two, he found that Plaintiff's conditions of left knee pain, degenerative disc disease of the lumbar spine, and depression were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 58-59.) At Step Four, he found that Plaintiff could perform light work with several limitations and was unable to perform any past relevant work. (Tr. at 60.) He also found that Plaintiff was forty-five years old on the alleged onset date, putting him into the "younger individual" range of eighteen to forty-four years old. (Tr. at 64.) At Step Five the ALJ found that, considering Plaintiff's age, education, work experience and RFC, there were jobs existing in the economy in significant numbers that Plaintiff could perform, and therefore Plaintiff was not disabled. (Tr. at 64-65.)

### E.    Administrative Record

### 1.    Medical History

On March 15, 2011, Plaintiff had a CT scan of his abdomen, which indicated kidney stones. (Tr. at 269-82.) On March 21, 2011, Plaintiff went to St. Mary's of Michigan complaining of left flank pain. (*Id.*) The notes indicate that the pain was probably the result of passing a kidney stone. (*Id.*) Plaintiff reported a history of back pain. (Tr. at 385.) The inspection of his lower extremities was normal. (*Id.*) He was oriented to time, place, and person. (*Id.*) He was released in stable condition. (Tr. at 392.)

Plaintiff went to Bridgeport Community Health Center ("Bridgeport") on May 4, 2011, complaining of kidney pain for the last three days. (Tr. at 305.) Plaintiff denied anxiety, depression, hopelessness, loss of interest, memory loss, and suicidal ideation. (Tr. at 306.) He was oriented to time, place, and person, his memory was intact, and he did not report depression or anxiety. (Tr. at 307.) His affect was theatrical. (*Id.*) He was prescribed Vicodin to take twice daily as needed. (*Id.*) A physical examination from March 31, 2011 showed Plaintiff was oriented to time, place, and person, and his memory was intact. (Tr. at 302.)

On June 1, 2011, Plaintiff complained of intermittent pain in both flank areas. (Tr. at 283-88.) He was given Flomax to help him pass his kidney stones and Vicodin for the pain. (*Id.*) On June 4, 2011, Plaintiff went to Bridgeport complaining of kidney pain for the last three days; his urine tests were all normal. (Tr. at 438, 441.) He denied anxiety, depression, and memory loss. (Tr. at 439.) He was oriented to time, place, and person and his affect was theatrical. (Tr. at 440.) He was given a Toradol injection, prescribed Vicodin, and he signed a drug contract. (*Id.*) By July 13, 2011 he appeared to have passed the kidney stones. (*Id.*) On September 4, 2011, Plaintiff went to Bridgeport Community Health Center complaining of back pain and painful urination. (Tr. at 319-20.) He was given Ultram for pain. (*Id.*) He

followed up on September 19, 2011, reporting that the pain returned when the medicine wore off. (Tr. at 323.)

Plaintiff went to Bridgeport on September 9, 2011 complaining of back pain and painful urination. (Tr. at 452-54.) Upon examination he had "mild tenderness in [his] lumbar spine." (Tr. at 454.) He was prescribed Ultram. (Tr. at 455.) Plaintiff returned to St. Mary's on November 8, 2011 complaining of bilateral flank pain and back pain. (Tr. at 402.) He rated his pain as a seven out of ten. (*Id.*) He had no numbness or motor weakness, he was alert and oriented times three, and he had paraspinal tenderness. (Tr. at 403.) He was given Dilaudid and Zofran, which appeared to make him more comfortable. (Tr. at 404.) The CT scan of the abdomen and pelvis was negative. (*Id.*) The CT scan of his lumbar spine "demonstrated minimal circumferential disc bulging with mild neuroforaminal stenosis." (Tr. at 406.) He was able to ambulate normally and he denied extremity weakness. (Tr. at 409.) He was given a prescription for Vicodin and discharged. (Tr. at 406.)

Plaintiff went to Bridgeport on November 21, 2011, complaining of back pain, tingling and swollen hands, and chest pain. (Tr. at 471.) He denied anxiety, depression, and loss of memory; he was oriented to time, place and person. (Tr. at 472-73.) His affect was theatrical and he exhibited drug-seeking behavior. (Tr. at 473.) His gait and station were normal, he had normal alignment and mobility in his head, neck, spine, ribs, and pelvis, and his range of motion and strength were normal. (*Id.*) On December 1, 2011, a note in his Bridgeport medical records indicated a diagnosis update of spondylosis without myelopathy. (Tr. at 478.)

On December 12, 2011, Plaintiff returned to Bridgeport complaining of constipation and aches and pains in his stomach and back—he reported that it felt "like something burst in his stomach." (Tr. at 479.) The pain assessment portion of the notes indicated that he answered

"no" as to whether he was currently in pain and as to whether he experienced chronic pain. (*Id.*) He denied anxiety, depression, and memory loss. (*Id.*) His affect was theatrical and he exhibited drug-seeking behavior. (Tr. at 482.) The numbness in his hands was not much of a problem but he was still having neck pain. (Tr. at 486.) His gait and station were normal, his head, neck, spine, ribs, and pelvis had normal alignment and mobility, and he had decreased range of motion to forward and lateral bend. (Tr. at 488.) His insight was very guarded, he was oriented to time, place, and person, his memory was intact for recent and remote events, and his affect was theatrical and he exhibited drug-seeking behavior. (*Id.*)

Plaintiff's February 22, 2012 cervical spine MRI was normal. (Tr. at 507.) A CT scan of his abdomen on May 22, 2012 showed "no acute abnormality." (Tr. at 508.) The same day, Plaintiff went to St. Mary's Emergency Department complaining of "ongoing right sided flank pain" and right back pain. (Tr. at 507-09.) The inspection of his lower extremities was normal. (Tr. at 510.) He was oriented times three and had a normal affect. (*Id.*) Plaintiff had negative lab work and CT scan, was given Dilaudid "with good relief," was prescribed Flexeril, and was discharged. (Tr. at 513-14.)

On June 4, 2012, Plaintiff went to Bridgeport complaining that his Tramadol (Ultram) was not working for his back pain; he also asked for a prescription for a cane. (Tr. at 521.) His pain medication was modified. (Tr. at 522.) His gait was normal, he had normal alignment and mobility in his head, neck, spine, ribs, and pelvis. (Tr. at 524.) His affect was theatrical and he exhibited drug-seeking behavior. (*Id.*) Plaintiff reported that he had been gardening but that it was not exacerbating his pain. (Tr. at 525.)

On July 17, 2012, Plaintiff received a medical consultative examination from Dr. Crowhurst, who completed a Physical RFC Assessment form. (Tr. at 501-06.) He indicated

that Plaintiff could occasionally lift twenty pounds, could frequently lift ten pounds, could stand or walk for a total of six hours in an eight-hour workday, could sit for a total of six hours in an eight-hour workday, and had an unlimited ability to push and/or pull. (Tr. at 502.) In his opinion, Plaintiff was able to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and never able to climb ladders, ropes, or scaffold. (Tr. at 503.) His environmental limitations included avoiding concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (Tr. at 504.) Dr. Crowhurst said there was no evidence of significant knee pathology. (Tr. at 506.) He said that "[o]n the basis of chronic low back pain, with palpable paraspinal muscle tenderness, and radiographic evidence of L5-S1 DDD, claimant should be restricted to a light level of work, with some postural and environmental restrictions." (*Id.*)

On September 13, 2012, Plaintiff was voluntarily admitted to HealthSource Saginaw's emergency room because of suicidal ideations. (Tr. at 564-65.) He was depressed because his unemployment benefits were about to run out, he was afraid he would lose his home, and he was having problems getting pain medicine for his chronic back pain. (*Id.*) He was positive for marijuana and cocaine and was diagnosed with depression due to substance abuse and alcohol and drug dependence. (Tr. at 543.) He was assessed with a Global Assessment of Functioning ("GAF") score of 25.[2] (Tr. at 565.) Plaintiff was admitted to the "mental health unit and closely observed on suicidal precautions"; he was treated first with Serax and later with Remeron. (Tr. at 561-62.) Upon admission he was ambulatory, but he complained of back

---

[2] According to the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a GAF score of 21 to 30 indicates the "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends.)" Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) [hereinafter *DSM-IV*]. The fifth edition of the DSM, however, rejects the use of GAF scores altogether. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

pain. (Tr. at 561.) Plaintiff was discharged on September 18, 2012 with a prescription for Remeron and told to follow up in seven days. (*Id.*) Upon discharge he denied suicidal ideations, was assessed with a GAF score of fifty-five,[3] and was "alert, friendly, and talkative." (Tr. at 562.)

On October 4, 2012 Plaintiff went to the Jane's Street Academic Community Health Center emergency department complaining of abdominal pain in his lower right quadrant that he rated as a ten out of ten. (Tr. at 529.) He reported chronic back pain in his medical history. (*Id.*) He reported no psychiatric history. (*Id.*) Plaintiff was alert, oriented times three, and had a normal affect. (Tr. at 530-31.) The lower extremity inspection was normal. (Tr. at 531.) A CT scan of the abdomen was normal. (Tr. at 531-32.) His condition improved with a Toradol injection and Zofran. (Tr. at 533.) There were concerns that he might have a small hernia. (*Id.*) He was told to follow up with his family physician or a general surgeon. (*Id.*) He was discharged with pain medication and told to follow up in two days if his condition had not improved. (*Id.*) Plaintiff was prescribed Lortab and ambulated without assistance upon discharge. (Tr. at 534.)

On October 8, 2012, Plaintiff went to St. Mary's of Michigan emergency department complaining of left-sided chest and arm pain. (Tr. at 536.) He reported a psychiatric history of depression. (Tr. at 537.) He was told to follow up with his primary care physician in one to two days and released in stable condition. (*Id.*) On October 9, 2012, Plaintiff went to Bridgeport to follow up from his emergency room visit. (Tr. at 549.) He rated his lower back pain to be a five out of five. (*Id.*) The impression was chronic depression and mood disorder. (Tr. at 552.) He

---

[3] A GAF score of fifty-one to sixty indicated, "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *DSM-IV, supra* at 34.

was prescribed Remeron and referred to Jane's Behavioral health for his depression. (*Id.*) He was also referred to Dr. Shaheen in general surgery for his possible hernia. (Tr. at 549.)

On October 21, 2012 Plaintiff went to St. Mary's of Michigan emergency department complaining of right lower abdominal pain, which he rated as a nine out of ten. (Tr. at 538.) The triage notes indicate that "Patient was told he has a hernia and is waiting to get an appointment with Dr. Shaheen." (*Id.*) A review of his symptoms indicated no back pain. (Tr. at 539.) He was oriented times three and had a normal affect. (Tr. at 540.) Plaintiff was again referred to Dr. Shaheen and given a refill prescription for his pain medication. (*Id.*)

On November 19, 2012, Plaintiff saw Dr. Maldonado regarding his possible hernias. (Tr. at 544-45.) Dr. Madonada did not find an inguinal hernia based on physical examination or radiological imaging. (*Id.*) Examination of his extremities was normal. (Tr. at 556.) The impression was sprain and strain of hip and thigh, orchitis of the right testicle, and presumed infectious colitis. (*Id.*) He recommended that Plaintiff do yoga to help strengthen his back muscles. (*Id.*)

### 2.     Adult Function Reports

In an adult function report, dated September 26, 2011, Plaintiff stated that from the time he woke up until the time he went to bed, he prepared his meals, watched television, took pain medicine for his kidney/bladder stones, and took brief walks. (Tr. at 202.) He did not provide care for anyone else or for any pets. (*Id.*) Before his illness he had better penmanship, was able to work longer hours, and was able to use his knees. (*Id.*) His condition affected his sleep in that sometimes he would awaken in pain. (*Id.*)

Plaintiff indicated that he did not have problems with his personal care and did not need reminders to take care of his personal needs or to take his medication. (Tr. at 202-03.) He

11

prepared his own meals daily, which typically took him fifteen to thirty minutes per meal. (Tr. at 203.) When asked to list indoor and outdoor household chores that he was able to do, Plaintiff stated that he was able to dust, water flowers, wash dishes, and do laundry. (*Id.*) He said it took him about an hour to dust, fifteen to twenty minutes to wash dishes, fifteen minutes to water the flowers, and one to two hours to do the laundry. (*Id.*) He went out every day, but "not for long." (Tr. at 204.) The only hobby he listed was watching racing on television. (Tr. at 205.) His social activities included visiting, dinners, ice cream socials, and picnics. (*Id.*) He did not need to be reminded to go places or to have people accompany him places. (*Id.*)

Plaintiff indicated that his illness affected squatting, bending, sitting, kneeling, completing tasks, using his hands, and getting along with others. (Tr. at 206.) He explained, "My body isn't up for physical activities[,] my handwriting is bad because of [carpal] tunnel and breaks in bones[,] [and] I need someone sometimes to write for me [because] [my hands] ache so bad." (*Id.*) He estimated that he was able to walk for a mile before needing to take at least a thirty minute break. (*Id.*) He was not able to pay attention for long periods. (*Id.*) He did not finish what he started and his ability to follow written and oral instructions and get along with others was "fair." (*Id.*) When asked how he handled stress, he responded he was "pretty mellow." (Tr. at 207.) When asked how he handled changes in routine, he responded "I adjust ok." (*Id.*) He indicated that he used a cane but did not say that it had been prescribed by a doctor. (*Id.*) He stated he took Ultram and that the side effects included "twitching," becoming very sleepy, and body aches. (*Id.*)

In the adult function report, dated March 17, 2012, Plaintiff stated that he did need reminders to take his medicine. (Tr. at 236.) He did not prepare his own meals. (*Id.*) He still was doing his own laundry. (*Id.*) He did not do housework or yardwork because it hurt to stand

for a long time. (Tr. at 237.) He said he was very withdrawn from life because of his condition. (*Id.*) He estimated he could walk two blocks before needing to take a fifteen minute break. (Tr. at 239.) He said it was "kind of hard" to handle stress and that he did not handle changes in his routine well. (*Id.*)

### 3.    Plaintiff's Testimony at Administrative Hearing

At the February 21, 2013 administrative hearing, Plaintiff testified as follows. (Tr. at 72-84.) He was unable to lift anything heavy, he tried not to bend down for very long or else he would have difficulty getting up and his hands would shake. (Tr. at 74-75.) He rated his back pain on a typical day as an eight out of ten. (Tr. at 75.) He also had pain and problems with his left knee, which he traced back to his time in the Navy. (Tr. at 75-76.) His back pain was exacerbated by stooping. (Tr. at 76.) His girlfriend helped him put his shirts on and tie his shoes because twisting and "bowing" caused excruciating pain. (Tr. at 76-77.)

He reported that he was unable to do much of anything around the house now. (Tr. at 77.) He estimated that he was only able to sit comfortably for about an hour before he needed to get up or lay down. (*Id.*) He also was only able to stand in one place for about an hour. (*Id.*) He said he spent most of the day lying down unless he was getting the mail, "having to go somewhere," or taking a walk. (Tr. at 78.)

He explained that his depression was "a constant thing." (*Id.*) About three to four times a week his depression got so bad that he would "almost double up on [his] meds." (Tr. at 79.) He had problems with suicidal thoughts and had attempted suicide at least once. (Tr. at 80.) He had "very bad" problems with his memory. (*Id.*)

If he had a job he would probably have to call in sick most days and would only be able to work two days a week. (Tr. at 81.) He testified that he quit working at Warwick Cleaners in

March 2012 because they "cut the shift." (Tr. at 81-82.) Warwick Cleaners allowed him to keep very sporadic work hours in accommodation of his pain—he usually only worked a few hours at a time. (Tr. at 82.) His girlfriend did his laundry and his family members would cook for him or bring him food, or he would go to McDonalds. (Tr. at 83.) His girlfriend did almost all the housework and his neighbor cut his yard. (*Id.*) He did very little socially besides the occasional trip to church. (Tr. at 84.) He did not watch much television; he liked to read mechanical books. (*Id.*)

### 4.      Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE") a series of hypothetical questions based on an individual with the same age, education, and work experience as the Plaintiff. (Tr. at 86.) For the first hypothetical, the ALJ asked the VE to assume that the individual was able to "occasionally climb ladders and ramps, balance, stoop, kneel, crouch and crawl, can never climb ladders, must avoid concentrated exposure to cold and heat, vibration, fumes, odors, poor ventilation and hazards." (Tr. at 86-87.) The VE testified that the first individual would not be able to perform any of Plaintiff's past work. (Tr. at 87.) However, the first individual would be able to perform work as a small products assembler (approximately 10,000 jobs in the region, which was defined as the lower peninsula of Michigan), an inspector or hand packager (5200 jobs in the region), and a cashier (16,000 jobs in the region). (*Id.*)

For the second hypothetical, the ALJ asked the VE to assume all of the first individual's limitations but to add a sit/stand at will option and the ability to "perform simple, one- and two-step tasks, not at a production rate, with occasional contact with others." (*Id.*) The VE testified that the only job that would remain with the added restrictions would be the inspector and hand packager jobs, but there would be other work that would fit within the added

14

restrictions. (*Id.*) The second individual would be able to work as a router (5000 in the region) and a garment sorter (reduced from 10,000 jobs to 5000 jobs because of the sit/stand option). (Tr. at 87-88.) An added limitation of consistently missing two or more days a month would make the third hypothetical individual unable to "maintain competitive employment." (Tr. at 88.)

Plaintiff's attorney then asked the VE whether any jobs would exist that the individual could perform if the individual had to "l[ie] down at intermittent and unexpected times throughout the day, above and beyond normal work breaks and lunches." (Tr. at 89.) The VE answered by first explaining that during an eight-hour day "there are two, 15 to 20-minute breaks that are compensated by the employer, and a 30 to 60-minute lunch period that is uncompensated." (*Id.*) He explained that "if someone was laying down, in addition" to the regular breaks "then it starts to erode the eight-hour day and the 40-hour work week." (*Id.*)

## F.    Governing Law and Analysis

## 1.    Legal Standard

The ALJ determined that Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb stairs, balance, stoop, kneel, crouch, or crawl. He should never climb ladders and must avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, poor ventilation and hazards. He can perform simple one and two step tasks with no production rate pace work and have only occasional contact with others. He should have the option to sit/stand at will.

(Tr. at 60.) The regulations define light work as involving

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do

15

substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial

16

evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.   *Analysis*

### i.   *Opinion Evidence, Credibility, RFC, and Hypothetical*

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be "medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of these medical opinions, including any treating source opinions that have not been given controlling

weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The regulations establish the following two step process for evaluating subjective symptoms, including pain. SSR 96-7p, 1996 WL 374186, at *2; *see also* 20 C.F.R. § 404.1529. First, the ALJ determines "whether there is an underlying medically determinable . . . impairment," that is, "an impairment[] that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the individual's . . . symptoms." *Id.* If there is not, then the symptoms "cannot be found to affect the individual's ability to do basic work activities," and the analysis ends. However, if the impairments "could reasonably be expected to produce the individual's symptoms," the ALJ

continues to the second step of the process. *Id.* At the second step, the ALJ evaluates the "intensity, persistence, and limiting effects" of the symptoms to determine how much they limit the claimant's "ability to do basic work activities." *Id.* Either a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are substantiated by objective medical evidence and the ALJ accepts them, or the ALJ makes a credibility assessment with respect to the claimant's statements to determine the symptom's actual intensity, persistence, and limiting effects. *Id.*; *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at

542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [the claimant] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The hypothetical is valid if it includes all *credible* limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

20

      *ii.     Plaintiff's Brief*

Plaintiff's argument is that "[b]ecause each element of the hypothetical does not accurately describe Mr. Henderson in all significant, relevant respects, the VE's testimony at the hearing should not constitute substantial evidence. The ALJ did not properly evaluate Mr. Henderson's impairments in the first hypothetical question, and therefore, the hypothetical is flawed." (Doc. 9 at 8.)

After citing regulations, case law, and Social Security Rulings for a few pages, without explaining how those citations apply to Plaintiffs case, Plaintiff reiterates his allegations regarding the severity of his symptoms:

> Here it is documented that Mr. Henderson has left knee pain, degenerative disc disease [of] the lumbar spine, and depression, yet the ALJ found claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. He noted the [VEs] testimony, that given all of the factors, the claimant would be able to perform certain jobs such as inspector, router, and garment sorter. This determination is erroneous.
>
> The claimant testified at the hearing that he was not able to hold a steady job due to the fact that he has sever[e] back and knee problems. Physically, his pain precludes him from working. He's limited in his ability to lift, stand for longer than 45 minutes, sit for longer than 60 minutes, and is precluded from reaching over head, stooping, bending, or doing stairs. He takes medication that causes him to become drowsy and take naps for multiple hours throughout the day. As a result, he takes medication. There's not a single employer out there that can accommodate multiple hour naps during the work shift. Just based off the physical problems and resulting side effects, he is not able to work.
>
> Finding that Mr. Henderson is capable of performing the positions of an inspector, garment sorter, or router while he continuously requires the need to rest and nap, is erroneous. To subject Mr. Henderson to perform these positions further subjects him to more pain and suffering. Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified, it's inhumane. Even the ALJ indicated that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" yet Mr. Henderson was deemed not credible. The limitations that Mr. Henderson faces effectively preclude him from

performing any work, including the listed representative occupations, and the reasoning to support his lack of credibility is not substantiated.

More so, the opinion by ALJ Gruenberg is not entirely accurate. He [sic] opined that the claimant was able to perform household chores, however, Mr. Henderson specifically testified that he "[does not] have to do anything." His girlfriend cleans the house, does the laundry, prepares meals for him, his neighbor cuts the grass—he does not, and is not, capable of doing household chores. To state that he is able to, when it is a direct contradiction to his testimony, is erroneous.

(*Id.* at 9-10.) Plaintiff then contends that the jobs the VE testified the hypothetical individual could do "would be far more demanding than what he's capable of doing. Additionally, they would all require him to not only be alert for the duration of the shift, but also to interact with the general public." (*Id.* at 10-11.) Plaintiff concludes,

Because the ALJ has correctly concluded that the 'claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . .' and the only justification for not labeling Mr. Henderson as 'disabled' at that time was due to credibility, I ask that the existing medical records be re-evaluated. Therefore, Mr. Henderson was under a disability prior to the date last insured.

(Doc. 9 at 11.)

   *iii.*  *Analysis*

When issues are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," they are deemed waived. *McPherson v. Kelsey*, 125 F. 3d 989, 995-96 (6th Cir. 1997). A court in this district has found that when a party's brief is "completely devoid of any discernable legal argument" the plaintiff's motion should be denied since the only argument in it has been waived. *Burger v. Commissioner of Social Security*, No. 12-11763, 2013 WL 2285375, at *5 (E.D. Mich. May 23, 2013). "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones. *McPherson*, 125 F.3d at 995-96.

In this case I suggest that any potential arguments Plaintiff may have regarding the credibility assessment, medical opinion analysis, and RFC assessment have been waived because he only has cited the case law and regulations and has provided the Court with no indication of how the law applies to the facts of his client's case.[4] With regard to the ALJ's credibility assessment, Plaintiff does not point to any of his statements that the ALJ discredited, nor does he argue that the ALJ failed to properly explain his credibility assessment. He does assert that the ALJ's opinion was "not entirely accurate because he "opined that the claimant was able to perform household chores, however, Mr. Henderson specifically testified that he '[does not] have to do anything.'" (Doc. 9 at 11.) But Plaintiff misrepresents the record by focusing solely on Plaintiff's testimony at the administrative record and ignoring the function reports where Plaintiff clearly stated that he did engage in activities of daily living, (Tr. at 201-12, 234-45.) Plaintiff also does not point to any medical sources whose opinions were improperly weighed. With regard to the assessed RFC, Plaintiff does not indicate what impairments should have been included in the RFC or where in the medical record evidence existed to support those impairments.

---

[4] This is not the first time this Court has had to puzzle through Plaintiff's counsel's patchwork of social security law with no indication of how the law applies. It has become such a problem in this District that in *Fielder v. Commissioner of Social Security*, signed on March 24, 2014, Chief Judge Rosen put Plaintiff's counsel on notice: "In light of this lamentable record of filing one-size-fits-all briefs and inviting the Judges of this District to formulate arguments and search the record on his clients' behalf, Plaintiff's counsel is strongly cautioned that this Court will carefully examine his submissions in future suits to ensure that they advance properly supported arguments that rest upon (and cite to) the facts of a particular case. Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings." 2014 WL 1207865, at *1 n. 1 (E.D. Mich. Mar. 24, 2014). Unfortunately, Plaintiff's attorney failed to heed this warning, and was sanctioned $2500 on February 27, 2015. *Servantes v. Comm'r of Soc. Sec.*, No. 14-10250, 2015 WL 870255, at *1 (E.D. Mich. Feb. 27, 2015) ("Like his previous filings before this Court, [Plaintiff's] Counsel failed to point to any of Plaintiff's medical records to support his argument . . . ."). Plaintiff filed the present Motion on October 15, 2014 (Doc. 9), after Judge Rosen's warning, but before the $2500 sanction. Therefore, I suggest that even though Plaintiff's attorney was on notice of potential sanctions, and even though he failed to heed the warning, he has already been sanctioned once and additional sanctions, while permissible, would be duplicative. However, the undersigned will seriously consider imposing sanctions like those imposed in *Servantes* if a similarly deficient brief is received after February 27, 2015.

Further, after reviewing the record, I suggest that substantial evidence supports the credibility assessment, RFC assessment, and medical opinion analysis. The ALJ followed the two step process laid out in Social Security Ruling 96-7p for evaluating Plaintiff's subjective symptoms. *See* SSR 96-7p, 1996 WL 374186. For the first step, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." However, for the second step, the ALJ determined that the objective findings did not support the alleged severity of the symptoms, and therefore Plaintiff's credibility was at issue. (Tr. at 60, 63.) The ALJ evaluated Plaintiff's credibility and found that his "statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms" were "not fully credible." (*Id.*) Specifically, with regard to Plaintiff's allegations about the severity of his back pain, the ALJ considered the fact that the objective medical evidence did not corroborate the severity of the symptoms, his doctor "observed no tenderness to palpitation of the lower back, . . . [t]here was only *mild* tenderness over [his] lumbar spine," his gait was normal, and he continued to work for a period after these objective findings. (Tr. at 60-61.) She noted that Plaintiff continued to ambulate normally, there was normal alignment and mobility of his head and neck, he had normal upper extremity range of motion, he had normal gait, and the suggested treatment of pain medicine and yoga was conservative in nature. (Tr. at 61.)

With respect to Plaintiff's complaints about his left knee pain, the ALJ noted his normal gait and station, the effectiveness of medicine in managing pain, the normal results of the lower extremity inspection, and the lack of objective evidence of left knee pathology. (*Id.*) The ALJ also discounted Plaintiff's credibility regarding allegations about the severity of his mental impairments due to depression. (*Id.*) The ALJ noted, "On or about his alleged onset date, a doctor from Bridgeport . . . observed no depression, anxiety, or agitation." (Tr. at 61-

62.) She also considered the fact that in November, 2011, "a clinician noted that his mood and affect was *theatrical* and he made persistent references to pain medications and exhibited *drug-seeking* behavior. He also denied anxiety, depression, memory, and sleep difficulties. He routinely denied suicidal thoughts." (Tr. at 62.) The ALJ also considered that Plaintiff's affect was normal in October, 2012. (*Id.*) She noted that Plaintiff had been suicidal in September, 2012 and had been assessed with a GAF score of 25, but emphasized that "[a]t discharge, Dr. Rao indicated that his prognosis appeared to be good with appropriate sobriety and regular counseling." (*Id.*)

The ALJ also noted the inconsistent statements Plaintiff made regarding his work history: "Specifically, he initially reported that he stopped working in August of 2011 because of his condition. Yet a review of his earnings records indicated that he worked in 2011 and 2012." (Tr. at 63.) She noted that Plaintiff "testified that he stopped working in March of 2012 because his employer 'cut his shift' and indicated that he could have continued working . . . ." (*Id.*) The ALJ reasoned, "The fact that his impairments did not prevent him from working before or after his alleged onset date, strongly suggests that they would not currently prevent work." (*Id.*) The ALJ also considered plaintiff's activities of daily living. At the hearing Plaintiff reported performing only a few activities, "[h]owever, the medical evidence indicated that [he] performed a much wider array of such activities . . . ." (*Id.*)

The ALJ gave little weight to the various GAF scores because "they were highly subjective and a non-standardized measure of symptom['s] severity that captured the claimant's level of functioning or symptoms only at the time of testing." (*Id.*) The ALJ gave great weight to the RFC assessment from Dr. Crowhurst because he "is an expert who is familiar with the disability program and its requirements," and because he "had the opportunity

25

to review the entire record at the time of his assessment and his findings are consistent with the evidence of record." (*Id.*) Finally, the ALJ gave "no weight to the State agency single decision maker findings dated November 18, 2011." (*Id.*)

### G.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 31, 2015                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 31, 2015                          By s/Kristen Krawczyk
                                              Case Manager to Magistrate Judge Morris